UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

HASSAN SULEIMAN KHALAF,

     Petitioner,

v.

     No. 6:25-CV-104-H

JOSHUA JOHNSON, et al.,

     Respondents.

## <u>ORDER</u>

Hassan Suleiman Khalaf is in ICE custody to enforce an indisputably valid order of removal issued against him last September after he entered the country on a tourist visa under false pretenses. Prior to his detention, Khalaf had attempted to purchase a firearm, and an Immigration Judge determined that he had recently made suspicious payments to persons or entities in war-ravaged Syria. ICE is working to remove Khalaf to Gaza or the West Bank through Israel. His habeas petition (Dkt. No. 1) makes three claims: (1) that there is no significant likelihood of his removal in the reasonably foreseeable future, thus requiring his release under the Due Process Clause; (2) that other substantive and procedural due-process considerations require his release; and (3) that his detention violates the Suspension Clause.

None of his claims succeed. Because the Court exercises jurisdiction over his petition, the Suspension Clause claim fails. Further, the respondents have demonstrated that his removal is significantly likely in the reasonably foreseeable future. That alone merits his detention, notwithstanding arguments about his ties to the U.S. or an absence of danger to his fellow man. The petition (Dkt. No. 1) is denied.

1.    **Background**

    A.    **Factual Allegations and Evidence**

Khalaf is a stateless man of Palestinian descent. Dkt. No. 1 ¶ 2. He was born in Lebanon, but in 2022 was residing in the United Arab Emirates. *See* Dkt. No. 8 at 16–17. In 2022, Khalaf left the UAE for reasons that are unclear. An immigration judge determined that the Emirati government ordered Khalaf removed because he provided money to persons or entities in Syria, which was then embroiled in a protracted civil war involving multiple terrorist organizations. *See id.* Khalaf denies these allegations and suspects they are lies drummed up by his former brother-in-law, who, he says, is seeking revenge against Khalaf for aiding Khalaf's sister in their divorce and custody dispute. *See* Dkt. Nos. 9 at 4; 9-1 at 67. Instead, he says that he lost work and thus had to leave the UAE upon the expiration of his work visa there. Dkt. No. 8 at 23–24.

Whatever the reason, Khalaf planned to immigrate to the United States illegally. He did so by lying on his B-2 visitor application by claiming that he was employed. *Id.* at 24. Khalaf's plan succeeded, and in January 2022 he came to the United States with his family in tow. Dkt. No. 1 ¶ 2. With no intention of abiding by the terms of his visa, his visa expired in July, and he remained without authorization. *See* Dkt. No. 8 at 9.

Two years later, in 2024, ICE placed Khalaf into removal proceedings. Dkt. No. 7 at 1. Khalaf was not initially detained. *See id.* However, in February 2025, Khalaf went to a local gun store and attempted to purchase a firearm. *Id.* at 1–2; Dkt. Nos. 9 at 2; 9-1 at 62. Khalaf says his gun application was "truthful" and that he attempted to purchase the gun to protect himself and his family. *See* Dkt. No. 9 at 3–4. In response to the attempted purchase, ICE placed Khalaf into custody that same month. Dkt. No. 7 at 1–2. While in

detention, Khalaf sought to be released on bond.  An IJ denied his request in May 2025, finding Khalaf's attempted gun purchase and money transfers to Syria, absent contrary evidence of peacefulness, demonstrated a potential danger to the public.  Dkt. No. 8 at 17.

In September 2025, an IJ ordered Khalaf removed.  Dkt. No. 7 at 2.  While Khalaf is a citizen of Lebanon, the IJ found that Khalaf qualified under the Convention Against Torture for withholding and deferral of removal to that country.  Dkt. No. 8 at 26–27.  Thus, the IJ ordered that Khalaf "be removed to any country other than Lebanon that will accept him."  *Id.* at 27 (emphasis omitted).  Khalaf's case is currently listed on ICE's third-country removal list to secure removal to a third country.  Dkt. No. 14 at 6.  Initially, ICE submitted removal documents to the UAE, but the UAE declined to accept Khalaf's return.  *Id.* at 5.  An application remains pending with the Israeli government for Khalaf's removal to Gaza or the West Bank.  *Id.* at 5–6.

Khalaf's habeas petition included his removal order as evidence.  Dkt. No. 1-2.  His reply brief contains various additional documents relating to his B-2 visa, his past employment in the UAE and removal therefrom, the gun-purchase investigation, a letter of support from his neighbor, and various positive customer reviews for his business.  *See generally* Dkt. No. 9-1.  In February, Khalaf submitted evidence noting the denial of his travel document application to the UAE.  Dkt. Nos. 12; 12-1.  And in May, Khalaf submitted a reply contending that removal to Gaza or the West Bank is unlikely.  *See* Dkt. No. 15.

In turn, the respondents initially provided the declaration of officer Benjamin Johnson, who stated that Khalaf's removal to Gaza or the West Bank via Israel or to the UAE was significantly likely in the reasonably foreseeable future, Dkt. No. 8 at 4–7, as well

as Khalaf's Notice to Appear, *id.* at 9–11, the order denying bond, *id.* at 13–14, 16–17, the BIA decision affirming his detention without bond, *id.* at 29–30, and an additional copy of the removal order, *id.* at 19–27.  In April, the respondents further provided the declaration of Aaron Nation, another ICE deportation officer, who noted that the UAE denied Khalaf's travel documents, but that a significant likelihood of removal in the reasonably foreseeable future remained as to Gaza, the West Bank, or to another country.  *See* Dkt. No. 14 at 3–6.

### B.    Procedural Background

On December 18, 2025, Khalaf petitioned for a writ of habeas corpus in this Court. Dkt. No. 1.   The Court ordered the respondents to show cause why Khalaf's writ should not be granted.  Dkt. No. 4.  The respondents answered (Dkt. Nos. 7; 8) and Khalaf replied (Dkt. No. 9).[1]  In February 2026, Khalaf notified the Court that the UAE had denied his travel document application.  *See* Dkt. Nos. 12; 12-1.  The Court ordered the parties to address the impact of the UAE's decision on Khalaf's likelihood of removal, as well as the impact of the ceasefire in the Iran conflict.  Dkt. No. 13.  Both parties responded.  Dkt. Nos. 14; 15.  The petition is ripe for review.

### 2.    Legal Standards

For well over a century, the Supreme Court has held that men and women subject to deportation have at least some measure of procedural due process protection.  *See The Japanese Immigrant Case*, 189 U.S. 86 (1903).  But the level of process to which they are

---

[1] At the time of the petition's filing, Khalaf was detained at the Eden Detention Center in Eden, Texas.  *See* Dkt. No. 1 ¶ 9.  ICE's Online Detainee Locator System indicates that he has since been transferred to Diamondback Correctional Center in Watonga, Oklahoma.  However, "[p]ersonal jurisdiction and venue are determined at the outset of litigation and are not affected by subsequent events."  *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003); *see also Moler v. Wells*, 18 F.4th 162, 166 n.7 (5th Cir. 2021).  Thus, the Court retains jurisdiction over Khalaf's petition.

entitled varies. *Compare Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982) (providing a process standard also provided to citizens), *with DHS v. Thuraissigiam*, 591 U.S. 103, 138–39 (2020) (providing minimal process). In this case, the parties propose two different standards of due process: that of *Mathews v. Eldridge*, 424 U.S. 319 (1976), and that of *Zadvydas v. Davis*, 533 U.S. 678 (2001).

Under the *Mathews* test, a court considers several factors. It must balance "the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures." *Landon*, 459 U.S. at 34 (citing *Mathews*, 424 U.S. at 334–35).

The Supreme Court decided *Zadvydas* and applied its test in the context of detention to enforce a final order of removal under 8 U.S.C. § 1231. Under that statute, the government must ordinarily remove an alien within 90 days of the final order of removal or else release him subject to supervision. 8 U.S.C. § 1231(a)(3). However, Section 1231(a)(6) provides that certain aliens "may be detained beyond the removal period." In *Zadvydas*, the Supreme Court interpreted Section 1231(a)(6) to determine how long the government may detain an alien pending removal under this Section. 533 U.S. at 682. The Court first determined that challenges to detainment under this provision are available under 28 U.S.C. § 2241, which is the basis of Khalaf's habeas petition. *See id.* at 688; Dkt. No. 1 ¶ 9. Turning to the merits, the Supreme Court concluded that the government may not detain aliens indefinitely under this provision. *Zadvydas*, 533 U.S. at 699. Doing so would violate due process because such long-term detention requires "a criminal proceeding with

adequate procedural protections." *Id.* at 690 (emphasis omitted). Rather, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. Courts facing these questions "must ask whether the detention in question exceeds a period reasonably necessary to secure removal." *Id.*

A court measures reasonableness "primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal." *Id.* Courts must also "take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters." *Id.* at 700. Further, courts must "listen with care when the Government's foreign policy judgments, including . . . the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise." *Id.*

"[T]o limit the occasions when courts will need to make" difficult judgments, the Supreme Court recognized a "presumptively reasonable period of detention" of six months. *Id.* at 700–01. After that six-month period, the alien has the burden of providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. After meeting this burden, the burden shifts to the respondents to provide evidence to rebut the alien's showing. *Id.* "[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

– 6 –

3.    **Analysis**

Khalaf's petition raises three claims, but some of these contain distinct grounds for relief.  In short order, Khalaf first says that he is entitled to a stay of removal under the Suspension Clause.  Dkt. No. 1 ¶¶ 51–53.  Next, he says he is entitled to an individualized and fair hearing to address (1) his claims against third-country removal, *id.* ¶ 42; and (2) his purported peaceability and lack of flight risk, *id.* ¶ 61.  Moreover, he contends that his detention violates due process because "it is extremely unlikely that [Khalaf will] be removed anytime soon."  *Id.* ¶ 64.

### A.    The Court exercises jurisdiction over Khalaf's claim, eliminating any Suspension Clause issue.

As a preliminary matter, the Court exercises its statutory jurisdiction under 28 U.S.C. § 2241 to address the merits of Khalaf's petition.  Khalaf objects that, "[a]bsent this [C]ourt's intervention, the government will summarily remove or cause the removal of [] Khalaf without such review, in violation of the Suspension Clause."  Dkt. No. 1 ¶ 52.  The solution, he contends, is to "issue [a] limited stay of removal needed to vindicate [his] rights to judicial review of his pending claims, including, if needed, to the Fifth Circuit Court of Appeals."  *Id.* ¶ 53.

Khalaf's assertions are puzzling.  The Suspension Clause is only implicated where there is a statutory provision "stripping jurisdiction to issue the writ."  *See Rodrigues v. McAleenan*, 435 F. Supp. 3d 731, 738 (N.D. Tex. 2020) (quoting *Boumediene v. Bush*, 553 U.S. 723, 771 (2008)).  But Khalaf fails to identify any jurisdiction-stripping statute.  And since the Court exercises its authority here, the Suspension Clause is not implicated.

To the extent Khalaf seeks to use the Suspension Clause to stay removal until the resolution of this petition at the Fifth Circuit, or even longer, that claim runs headlong into

Supreme Court precedent.  As the Supreme Court explained in *Thuraissigiam*, the writ of habeas corpus has never been used "to obtain anything like . . . authorization for an alien to remain in a country other than his own or to obtain administrative or judicial review leading to that result."  591 U.S. at 120.  Perhaps Khalaf seeks "procedural delay" to secure "more time in the United States."  *See Santana-Gonzalez v. Bondi*, 172 F.4th 736, 746 (9th Cir. 2026) (VanDyke, J., concurring) (discussing affirmance of BIA decision).  However, so far as the great writ is concerned, there is no such right and no such claim arising under the Suspension Clause.  *Thuraissigiam*, 591 U.S. at 120; *see also Livas v. Myers*, 455 F. Supp. 3d 272, 278 n.9 (W.D. La. 2020) (noting that "no cause of action arises under the Suspension Clause itself").  Thus, Khalaf's Suspension Clause claim fails.

> **B.**    ***Zadvydas*'s likelihood-of-removal standard displaces other procedural due process claims.**

Next is Khalaf's procedural due process claim seeking an individualized hearing addressing the public-safety and flight-risk factors.  Dkt. No. 1 ¶ 61.  Khalaf makes two arguments.  First, he relies on the three-factor balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976), to assert that he is entitled to release.  Dkt. No. 1 ¶¶ 44, 47.  Second, citing *Zadvydas*, he asserts that he cannot be re-detained or remain in continued detention without an individualized hearing where the respondents "prov[e] . . . before this Court" that his detention "further[s] the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community."  Dkt. No. 1 ¶¶ 59, 61.  Khalaf is correct that *Zadvydas* applies, but, as a result, the *Mathews* test does not.  Moreover, Khalaf's reliance on the *purposes* of *Zadvydas* ignores the actual test in that case: whether there is a "significant likelihood of removal in the reasonably foreseeable future."

533 U.S. at 701.  That standard—and not the alternatives proposed by Khalaf—is the standard that governs this case.

### i.     *Mathews* does not govern.

The Court previously addressed the application of *Mathews* to removal cases in *Ladak v. Noem*, 814 F. Supp. 3d 712 (N.D. Tex. 2025).  There, the Court observed that the assumption that *Mathews* applies de facto to detention claims "runs counter to precedent." *Id.* at 725.  In *Dusenbery v. United States*, the Supreme Court explained that it has "never viewed *Mathews* as announcing an all-embracing test for deciding due process claims."  534 U.S. 161, 167 (2002).  More obviously, in many "immigration-detention challenges, the Supreme Court has not relied on the *Mathews* framework."  *Rodriguez Diaz*, 53 F.4th at 1214 (Bumatay, J., concurring) (citing *Demore v. Kim*, 538 U.S. 510, 521–31 (2003); and *Reno v. Flores*, 507 U.S. 292, 299–315 (1993)).  Chief among these is *Zadvydas* itself.  The Supreme Court interpreted Section 1231 to contain a measure of due-process protections "to avoid a serious constitutional threat."  533 U.S. at 699.  It is not as if the Supreme Court intended to integrate *Mathews* into its reasoning: it cited *Landon* to acknowledge that "the nature of [due process] may vary depending upon status and circumstance" and then proceeded with its own distinct test for due-process protection.  *Id.* at 694.

Even were the Court to set aside the *Mathews* three-factor test's conspicuous absence in *Zadvydas*, *Demore*, and *Reno*, application of the *Mathews* test is unwarranted on its own terms.  As the Supreme Court explained in *Landon*, "[t]he constitutional sufficiency of procedures provided in any situation . . . varies with the circumstances."  459 U.S. at 34. *Landon* distinguished its peculiar type of immigration case—involving a long-time lawful permanent resident—from detaining aliens at the border or returning lawful permanent

residents who had spent time abroad. *Id.* at 32–33. By contrast, aliens detained at the border are only entitled to "the procedure authorized by Congress." *Thuraissigiam*, 591 U.S. at 138–39 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).

Khalaf fits firmly into the latter category. As *Thuraissigiam* explains, "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). Khalaf is one such alien: he entered the United States several years ago on a fraudulent B-2 visitor visa and overstayed. Dkt. Nos. 1 ¶ 2; 8 at 9. He is here illegally and only remains because the United States has failed to remove him. "He is therefore only entitled to a more limited form of process." *Ladak*, 814 F. Supp. 3d at 726. (citing *Thuraissigiam*, 591 U.S. at 139).

Finally, the most persuasive reading of *Zadvydas* is not that it provides a due-process test in addition to *Mathews*, but that it supplants it outright. As the Sixth Circuit explained, "the Supreme Court has had occasion to consider the constitutional implications of indefinite detention under [Section] 1231(a). In applying the canon of constitutional avoidance, the Court offered us a standard through which to judge indefinite-detention cases—the *Zadvydas* standard . . . ." *Martinez v. Larose*, 968 F.3d 555, 566 (6th Cir. 2020). "In other words, the *Zadvydas* standard *is* due process: a [Section] 1231 detainee who fails the *Zadvydas* test fails to prove a due process violation." *Castaneda v. Perry*, 95 F.4th 750, 760 (4th Cir. 2024) (emphasis in original).

### ii.      Khalaf's depiction of *Zadvydas* is incorrect.

In addition, Khalaf argues that *Zadvydas* requires an up-front hearing where the respondents must "demonstrate[] that Khalaf—who has no criminal history and has close

ties in his community—needs to be detained" in light of "the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community." Dkt. No. 1 ¶ 61. But while *Zadvydas* discusses these interests, 533 U.S. at 691–92, it made clear that the "potentially permanent" nature of the confinement made the lack of flight risk or danger particularly salient, *id.* For that reason, the Court constrained the removal statute to a likelihood-of-removal standard.

Thus, "[b]ecause 'the *Zadvydas* standard *is* due process,'" an alien petitioner "is deprived of no liberty by his detention anticipating removal consistent with the protections set forth in that case." *Ladak*, 814 F. Supp. 3d at 730 (quoting *Castaneda*, 95 F.4th at 760 (emphasis in original)). Even assuming the allegations of Khalaf's ties to Syrian actors and attempted gun purchase amount to nothing and that he is a peaceable and obedient man, "he has no 'right . . . to remain in a foreign country.'" *Id.* (quoting *Thuraissigiam*, 591 U.S. at 122). Instead, "Congress is empowered to detain for 'a period reasonably necessary to bring about [Khalaf's] removal from the United States.'" *Id.* (quoting *Zadvydas*, 533 U.S. at 689); *see also Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("We think it clear that detention or temporary confinement, as part of the means necessary to give effect to . . . the exclusion or expulsion of aliens, would be valid."). This is the "outer bounds" of congressional authority, and, provided that *Zadvydas* applies, Khalaf's other considerations are insufficient to merit release. *Wang v. Ashcroft*, 320 F.3d 130, 146 (2d Cir. 2003), *superseded by statute on other grounds*, *Avila-De La Cruz v. Blanche*, No. 23-7919, 2026 WL 1529890 (2d Cir. June 1, 2026); *Ladak*, 814 F. Supp. 3d at 730.

**C.    Because there is a significant likelihood that Khalaf may be removed to a third country in the reasonably foreseeable future, the respondents did not violate the Fifth Amendment.**

Khalaf asserts that the respondents violated the Due Process Clause of the Fifth Amendment by holding him in detention without a significant likelihood of removal in the reasonably foreseeable future.  *See* Dkt. No. 1 ¶ 64.[2]  "To prevail, the respondents need only establish 'a significant likelihood that removal in the reasonably foreseeable future may occur,' rather than 'be certain or immediate.'"  *Ladak*, 814 F. Supp. 3d at 726 (quoting *Nguyen v. Noem*, 797 F. Supp. 3d 651, 666 (N.D. Tex. 2025) (*Nguyen v. Noem*)).

The facts here are straightforward.  Shortly after the final order of removal issued, the respondents prepared travel document applications for Khalaf to Israel, Gaza, the West Bank, and the UAE.  Dkt. No. 8 at 6–7.  His UAE application was rejected, but the other applications remain pending.  *See* Dkt. No. 12 at 1.  It is a matter of public record that the United States is actively "deporting individuals of Palestinian descent" like Khalaf to Gaza or the West Bank through Israel.  *Alsheref v. Noem*, No. 1:25-CV-190, Dkt. No. 21 at 11 (N.D. Tex. Dec. 3, 2025) (*Alsheref I*).  That includes individuals like Khalaf who were born outside of Gaza, the West Bank, or Israel.  *Id.*  In *Alsheref I*, the Court concluded that these facts rendered the petitioner's removal significantly likely in the reasonably foreseeable future.  *Id.*

Khalaf seeks to distinguish *Alsheref I* on two grounds: (1) that, unlike the present case, there is no "evidence that Israel is willing to issue a travel document," Dkt. No. 15 at 5; and

---

[2] Khalaf also challenges his detention for want of "changed circumstances."  Dkt. No. 1 ¶ 42.  But the changed-circumstances inquiry only applies to aliens who have previously been released on an OSUP.  *See* 8 C.F.R. § 241.13(i)(2).  Khalaf has never received an OSUP, as he has been in continuous custody since his order of removal issued in September 2025.  Dkt. No. 7 at 2.

(2) that a United States Magistrate Judge has recommended the release of that petitioner in a subsequent case. *See Alsheref v. Mullin*, No. 5:26-CV-089, Dkt. No. 17 (W.D. Okla. Mar. 16, 2026) (*Alsheref II*). Both points are unpersuasive. The evidence in *Alsheref I* was a "new policy of removal." No. 1:25-CV-190, Dkt. No. 21 at 13. There was no specific evidence that Israel was willing or unwilling to issue a travel document to that specific petitioner. And no such evidence is required. Rather, "a broad change in circumstances that applies to a broad group of aliens can[] have the effect of changing the circumstances of each of those particular aliens." *Nguyen v. Noem*, 797 F. Supp. 3d at 666.

As for the *Alsheref I* petitioner's subsequent habeas petition, the Court observes that the Magistrate Judge's report and recommendation is contested, and proceedings remain underway in that case. *See Alsheref II*, No. 5:26-CV-089, Dkt. Nos. 17 to 20. Even so, the ongoing litigation in *Alsheref II* is unpersuasive. That deportation efforts might fail in individual cases does not assail the underlying removal policy. And unless evidence persuades to the contrary, the policy may still support a significant likelihood of removal. *Nguyen v. Noem*, 797 F. Supp. 3d at 666. Indeed, a petitioner may be detained even if "his deportation is neither certain nor guaranteed" so long as a significant likelihood of his removal in the reasonably foreseeable future exists. *Ladak*, 814 F. Supp. 3d at 729–30 (internal quotation marks omitted). Khalaf fails to persuade that this removal policy, either in general or specifically as applied to him, is not in force.

Moreover, Khalaf objects that the United States' recent conflict with Iran renders removal unlikely. Dkt. No. 12 at 1–2. Khalaf did not provide any evidence that the conflict has impeded removals to Gaza or the West Bank. *See id.* The respondents likewise indicate that "there is no update as to how processing times may be delayed" in light of the conflict

or ceasefire.  Dkt. No. 14 at 5.  As it stands, there is no evidence negating the likelihood of removal as a result of the Iran conflict, which has now entered a period of ceasefire as the parties to that conflict negotiate a lasting peace.  Moreover, the Court notes that "[i]t typically takes the Government of Israel roughly three (3) to six (6) months to approve [a] travel request [application] for transiting to the Palestinian territories."  *Id.*  Thus, Khalaf's travel application—which was filed in December 2025—is only one month delayed from the normal time required for approval.  *See id.*  Accordingly, the Court is not persuaded that the Iran conflict renders his removal less than significantly likely in the reasonably foreseeable future.

The evidence here shows that Khalaf's travel application is actively pending, and that the U.S. government has successfully removed individuals of Palestinian descent to Gaza or the West Bank in recent months.  *See Alsheref I*, Dkt. No. 21 at 10–14.  Thus, a significant likelihood of removal to Gaza or the West Bank exists in the reasonably foreseeable future.  The Court also concludes that, even if removal to these territories were less than significantly likely, "the requisite likelihood" would also exist "when combined with the new and very real potential for third-country removal."  *Ladak*, 814 F. Supp. 3d at 729–30 (internal quotation marks omitted).  For this reason, the Court need not decide whether mere presence on ICE's third-country removal list satisfies the *Zadvydas* standard in these circumstances.  *See* Dkt. No. 15 at 5–6.

4.    **Conclusion**

For all of these reasons, the Court denies Khalaf's petition for a writ of habeas corpus (Dkt. No. 1).  His motion to expedite (Dkt. No. 17) is denied as moot.

– 14 –

– 15 –

So ordered on June 24, 2026.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE